UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WILLIAM MANUEL ALVAREZ-CALO,

                    Petitioner,

        v.

MIKE OBENLAND,

                    Respondent.

CASE NO. 3:19-CV-5904-TL-DWC

REPORT AND RECOMMENDATION

Noting Date: September 30, 2022

    The District Court has referred this action to United States Magistrate Judge David W. Christel. Petitioner William Manuel Alvarez-Calo filed his federal habeas petition pursuant to 28 U.S.C. § 2254, as amended on June 21, 2022, seeking relief from his state court conviction and sentence ("Amended Petition"). *See* Dkt. 42. The Court concludes that the state court's adjudication of the five grounds raised in the Amended Petition was not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned recommends the Amended Petition be denied and a certificate of appealability not be issued.

# I.    Background

A.    <u>Factual Background</u>

On November 9, 2016, in the Pierce County superior court ("trial court"), a jury found Petitioner guilty of murder in the first degree and burglary in the first degree. Dkt. 8-1, Ex. 1, at 2–3. Petitioner was sentenced to 370 months confinement on December 16, 2016. *See id.* at 7–8. The Court of Appeals of the State of Washington ("state court of appeals") summarized the facts of Petitioner's case as follows:

[I]A.  THE MURDER AND INITIAL INVESTIGATION

On November 12, 2012, Robert Smith, Jiffary Mendez, Michael Rowland, Fidel Gaytan Gutierrez, Mazzar Robinson, and Ray Turner arrived at Juan Hidalgo-Mendoza's apartment in an area of Lakewood, Washington, known as Chocolate City because of its reputation as a place to go to obtain heroin, intending to steal drugs and money. Upon entering the apartment, one of the men shot and killed Jaime Diaz-Solis. All of the men immediately fled.

Hidalgo-Mendoza, who had been in another room when the shooting occurred, fled the apartment through the bedroom window and had a neighbor contact the police. He then returned to the apartment and discovered that Diaz-Solis had been shot. Hidalgo-Mendoza moved Diaz-Solis outside and then removed a gun, drugs, and $38,000 from the apartment and put them under the neighbor's deck and in his truck. When the paramedics arrived, they attempted to revive Diaz-Solis, but they were unable to do so. Diaz-Solis died from the gunshot wound.

During the murder investigation of Diaz-Solis, officers found the items Hidalgo-Mendoza had hidden under the deck. Law enforcement officers later discovered large amounts of heroin and methamphetamine hidden inside the walls of Hidalgo-Mendoza's apartment. Hidalgo-Mendoza and his cousin Alberto Mendoza Ortega, who was also known as Yeto, [footnote omitted] were subsequently charged with drug trafficking related to the drugs found in the apartment. But several months passed without a lead in the murder investigation.

B.  CALO'S POLICE INTERVIEWS [FOOTNOTE OMITTED]

1.  FEBRUARY 22 INTERVIEW

In February 2013, Calo was charged in Lakewood with a misdemeanor driving offense and in Pierce County with second degree identity theft and third degree driving with a suspended license. On February 11, Calo asked Kristin Fay, his

attorney in the Lakewood misdemeanor matter, to put him in contact with the officers who were investigating Diaz-Solis's murder. Calo told Fay that he wanted to provide information on the murder in exchange for the dismissal of his Lakewood and Pierce County cases. Fay continued the Lakewood case so she could consult her supervisor Ken Harmell.

Fay consulted Harmell and attempted to contact Mary Kay High, Calo's counsel on his Pierce County felony charge. Fay was unable to contact High. Sometime after February 11, Fay "caused a message to be sent to Detective [Les] Bunton" about Calo's request. Clerk's Papers (CP) at 232.

On February 22, Calo, who was in custody on a felony charge in Pierce County, was brought from the Pierce County Jail to the Lakewood Municipal Court for a hearing on the Lakewood matter. Harmell assumed Calo's representation in the Lakewood matter. Detective Bunton and Lakewood Police Department Investigator Jason Catlett were also present, and they talked to Harmell about speaking with Calo.

Harmell then met with Calo and an interpreter to discuss whether Calo should talk to the officers. During the 20- to 30-minute meeting, Harmell told Calo that he (Harmell) thought it "was a bad idea to talk with detectives" and expressed his concern about Calo's safety due to the type of information Calo was planning to provide. CP at 233. Calo dismissed Harmell's attempt to talk him (Calo) out of meeting with the officers and "was not concerned about being implicated and was positive that he would not get caught up with the murder." CP at 233. Despite Harmell's advice, Calo agreed to talk to the officers at the Lakewood Police Station.

Detective Bunton and Investigator Catlett transported Calo to the Lakewood Police Station for the interview. [court footnote: Detective Bunton testified that they interviewed Calo at the police station so other inmates did not see him talking to the police at the Lakewood Municipal Court.] At that time, Calo was in jail clothing and was handcuffed. Because he was in custody on the Pierce County charges, Calo was not free to leave.

At no point during the interview process did the officers advise Calo of his *Miranda*[ ] rights. Calo told the officers about his contacts and involvement with a narcotics cartel, identified the photographs of some of the people he was talking about, and implicated some of his associates in the murder.[ ]

Although "Harmell [had] declined to accompany . . . Calo to the interview," Harmell subsequently talked to the prosecutors in both matters about dismissing the pending charges against Calo. CP at 233. Harmell also attempted to contact High about the felony case. Calo's Lakewood misdemeanor case was dismissed on March 5. On March 13, the Pierce County felony case was dismissed, and Calo ultimately pleaded guilty to an amended charge of one count of second degree driving while license suspended.

1

2

    2.  MARCH 18 INTERVIEW

3
        On March 18, Calo, who was no longer in custody, met with the officers for a second time at the Lakewood Police Department. The officers did not advise Calo of his *Miranda* rights during this interview.

4

5
        During this interview, Calo provided more information about the murder and drug trafficking activities and identified some suspects from photo montages. The officers questioned Calo about other evidence they had obtained that contradicted part of his February 22 statement.

6

7
        At this time, Investigator Catlett agreed to pay Calo, and Calo "was acting as a paid informant." CP at 234. Calo met with Investigator Catlett at least two more times before March 26, but these meetings were not recorded.

8

9
    3.  MARCH 26 INTERVIEW

10
        On March 26, Calo, who was still not in custody, met for a third time with the officers at the police station. Again, the officers did not advise Calo of his *Miranda* rights despite having probable cause to believe that Calo was "a co-conspirator or was rendering criminal assistance." CP at 234.

11

12

13
        During this interview, Calo "made incriminating statements including that he had a part in arranging the hit to happen." CP at 234. After this meeting, the officers spoke to the prosecutor and had probable cause to arrest Calo for murder and conspiracy.

14

15
    4.  JUNE 21 INTERVIEW AND ARREST

16
        On June 21, Calo met with the officers in an unmarked police vehicle. This time, the officers advised Calo of his *Miranda* rights.

17

18
        Investigator Catlett read Calo his rights in English because Calo told them that he was dyslexic and did not read English well. After signing the waiver form and talking to the officers for 45 minutes to an hour, the officers arrested Calo.

19
* * *

20
[II]B.  TRIAL

21

1.  TESTIMONY

22

23
        At trial, the State presented evidence that Calo worked for Yeto and assisted him with his drug sales. Yeto, in turn, got his drugs from Hidalgo-Mendoza.

24

The State also presented evidence that Calo worked as a mechanic in a garage that Yeto rented. Calo's relationship with Yeto eventually deteriorated over disagreements about drugs, money, and Calo's performance, and Calo stopped working for Yeto. At this point, Calo owed $25,000 to $30,000 to Yeto.

In October 2012, Calo was arrested. Yeto, Mendez, and some of Calo's other friends bailed him out of jail. After this, Calo started working for another drug supplier.

After Calo got out of jail and his debt to his new supplier started to mount, Calo started talking to Mendez and others at the garage about wanting to rob and murder Yeto and take his place in the drug trade. According to Mendez and Jacinto Uscanga, on the night of the murder, Calo met with several of his friends at his garage to discuss a plan to steal Yeto's drugs and, possibly kill him. They also discussed a plan to raid Hidalgo-Mendoza's apartment and steal any drugs or money. As they were making plans, the person who had been recruited to shoot Yeto declined to participate, but the plan to raid Hidalgo-Mendoza's apartment remained in play. Before the men left the garage, Calo provided some of them with firearms.

According to Smith and Mendez, although Calo and his cohorts knew that Hidalgo-Mendoza's apartment might be empty and the apartment appeared empty when the men arrived, they were aware that someone could be home and they were prepared to go through with their plans even if people were there. The men planned to restrain anyone who was present and they took duct tape and zip ties with them when they entered the apartment.

Smith testified that when the men entered the apartment through an unlocked back door, Robinson shot Diaz-Solis. The men immediately fled the scene.

The State also played redacted versions of the four police interviews for the jury. Investigator Catlett also testified about the interviews.

Investigator Catlett testified that during the February 22 interview, Calo stated that when he was in jail in October 2012, Borrego gave him a message to deliver to Yeto. The message stated that Borrego wanted Hidalgo-Mendoza killed. Calo said that he passed Borrego's message on to Yeto and that on the night of the murder, Yeto had called him for a ride "out of the Chocolate City area." 16 Verbatim Report of Proceedings (VRP) at 1830. Calo also offered to provide the officers with information on drug trafficking in the area.

Investigator Catlett further testified that during the March 18 interview, Calo provided more detail and admitted that he had lied about Yeto calling for a ride on the night of the murder. Instead, Calo told the officers that it was "two black males," Robinson and another man Calo referred to as "Sweet," who needed to be picked up in Chocolate City. 16 VRP at 1839–40.

Investigator Catlett then testified that during the March 26 interview, Calo stated that he had contacted Robinson and asked him to "kill and rob . . . Hidalgo-Mendoza and whoever else might be there." 16 VRP at 1911–12. Calo said that he had offered Robinson $10,000 and the drugs or money in the apartment. Calo also admitted that he had someone show Robinson where the apartment was.

Investigator Catlett further testified that during the June 21 interview, Calo admitted that he and the others had met at his garage before the shooting and then returned to his garage. Calo also admitted once again that he had met with Robinson and had arranged the robbery and murder with him. Calo asserted, however, that he was just following Borrego's and Yeto's orders because he feared for his life.

The defense did not present any evidence.

Dkt. 8-1, Ex. 11, *State v. Alvarez-Calo*, No. 49794-8-II (2018), at 204–08; 211–13 (some footnotes omitted).

B. Procedural Background

1. *Direct Appeal*

Petitioner challenged his conviction and sentence on direct appeal. *See* Dkt. 8-1, Exs. 2–10. The state court of appeals affirmed Petitioner's convictions but remanded for the superior court to strike all references to the vacated conviction for attempted first degree robbery, and to reexamine on remand whether to impose certain fees against Petitioner. Dkt. 8-1, Ex. 11. Petitioner sought discretionary review by the Washington State Supreme Court ("state supreme court"). Dkt. 8-1, Ex. 14. On April 3, 2019, the state supreme court denied Petitioner's petition for review without comment. Dkt. 8-1, Ex. 23. The state court of appeals issued its mandate on April 9, 2019. Dkt. 8-1, Ex. 24.

After the issuance of the mandate, Petitioner filed a *pro se* motion in the state supreme court seeking authorization to file a new petition for review. Dkt. 8-1, Ex. 25. The state supreme court filed the motion in the closed case file without action because Washington Rules of

Appellate Procedure do not allow for the filing of a second petition for review, and because the state court of appeals had already issued the mandate. Dkt. 8-1, Ex. 26.

Thereafter, the Pierce County prosecutor filed a motion for an order correcting judgment and sentence, which the trial court granted on June 21, 2019. Dkt. 44-1, Ex. 28. Petitioner appealed the corrected judgment to the state court of appeals, which affirmed the corrected judgment on March 23, 2021. Dkt. 44-1, Ex. 32, 33. The state court of appeals issued its mandate on April 29, 2021. Dkt. 44-1, Ex. 34.

2. *Personal Restraint Petition*

In May 2020, Petitioner filed a personal restraint petition ("PRP") seeking state post-conviction relief. Dkt. 44-1, Ex. 35. The state court of appeals dismissed the PRP on October 6, 2021. Dkt. 44-1, Ex. 38. Petitioner then sought discretionary review from the state supreme court, which was denied by the commissioner of the state supreme court on January 26, 2022. Dkt. 44-1, Exs. 39, 40. Petitioner moved to modify the commissioner's decision. Dkt. 44-1, Ex. 41. The state supreme court denied the motion to modify without comment and the state court of appeals issued the certificate of finality on May 13, 2022. Dkt. 44-1, Exs. 42, 45.

3. *Federal Petition*

On September 25, 2019, Petitioner initiated this case. Dkt. 1. In his Amended Petition, filed June 21, 2022, Petitioner raises the following grounds for relief:

1. The trial court erred when it declined to suppress Mr. Alvarez-Calo's recorded interviews with police that violated his state and federal constitutional rights.

2. Mr. Alvarez-Calo received ineffective assistance of counsel, requiring suppression of his statements and vacation of his conviction.

3. Mr. Alvarez-Calo was subjected to an unconstitutional two-step police interrogation tactic.

4.  The State violated Alvarez-Calo's right to a fair trial when the prosecutor committed misconduct by making inflammatory and prejudicial comments about him during opening statements.

5.  Trial counsel rendered ineffective assistance when he failed to object to testimony from Mr. Mendoza-Ortega that he had bailed Mr. Alvarez-Calo out of jail on multiple occasions.

Dkt. 42. On July 11, 2022, Respondent filed, and served on Petitioner, an Answer to the Petition. Dkt. 43. In the Answer, Respondent asserts the state court's adjudication of the grounds raised in the Amended Petition was not contrary to, or an unreasonable application of, clearly established federal law. *Id*. Petitioner filed a traverse on August 1, 2022. Dkt. 45.

## II. Discussion

Respondent maintains the state court's adjudication of the grounds raised in the Amended Petition was not contrary to, or an unreasonable application of, clearly established federal law. Dkt. 43.

### A. Standard of Review

Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In interpreting this portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

1    Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply

2    because that court concludes in its independent judgment that the relevant state-court decision

3    applied clearly established federal law erroneously or incorrectly. Rather, that application must

4    also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An

5    unreasonable application of Supreme Court precedent occurs "if the state court identifies the

6    correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts

7    of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court

8    decision involves an unreasonable application of Supreme Court precedent "'if the state court

9    either unreasonably extends a legal principle from [Supreme Court] precedent to a new context

10   where it should not apply or unreasonably refuses to extend that principle to a new context where

11   it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529

12   U.S. at 407).

13   Under 28 U.S.C. § 2254(d)(2), a federal habeas petition also may be granted "if a

14   material factual finding of the state court reflects 'an unreasonable determination of the facts

15   in light of the evidence presented in the State court proceeding.'" *Juan H. V. Allen*, 408 F.3d

16   1262, 1270 n.8 (9th Cir. 2005) (9th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(2)).  However,

17   the Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas courts to

18   presume the correctness of state courts' factual findings unless applicants rebut this presumption

19   with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of state court

20   decisions under §2254(d) is "limited to the record that was before the state court that adjudicated

21   the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

22

23

24

B.  Admission of Petitioner's Statements to Police (Grounds 1 and 3)

In connection with his challenge to the admission of his statements to police, Petitioner asserts two grounds for relief. In Ground 1, Petitioner argues that he was subject to custodial interrogation without receiving *Miranda* warnings. Petitioner also argues that police deliberately thwarted his right to counsel when they continued to interrogate him outside the presence of counsel. In Ground 3, Petitioner contends that he was subjected to an unconstitutional two-step police interrogation, subjecting him first to a custodial interrogation without the benefit of *Miranda* warnings, and then subjecting him to a second interrogation after he had already confessed. The Court will discuss these Grounds in turn.

1.  *Ground 1*

i.   Custodial interrogation

As set forth above, Petitioner first claims that he was in custody for purposes of the initial interviews and, therefore, was entitled to *Miranda* warnings prior to those interviews, which the police did not provide. In support of this claim, Petitioner asserts the following:

> [T]he circumstances do not suggest that, at the point that he gave his first statement, Mr. Alvarez-Calo felt he had any right to truncate the interrogation. Yes, he had indicated potential future willingness to speak with authorities and, yes, he was going to be in custody regardless, but he was taken to a geographically separated police precinct in handcuffs and shackled, placed in a locked room, questioned for over an hour, and never told he had an opportunity to decline speaking at any moment.
>
> Mr. Alvarez-Calo went where officers told him to go and had no indication that he was free to leave or to cut off communication. . . . Mr. Alvarez-Calo was a very suggestible individual with a minimal grasp on the English language relying on a police investigator who was not a certified interpreter to translate for him. He was speaking in a locked room with authorities who admitted that they were very eager to solve a murder.

Dkt. 42 at 30.

In a pretrial hearing conducted pursuant to Washington Superior Court Criminal Rule (CrR) 3.5 to determine the admissibility at trial of the various statements Petitioner made to police during their investigation, the trial court concluded that the initial interviews were non-custodial and that Petitioner's statements were admissible. Dkt. 44-1, Ex. 46, at 468.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. This privilege applies in the context of custodial interrogations, *Miranda v. Arizona*, 384 U.S. 436, 467 (1966), and is binding on the states, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). In *Miranda*, the Supreme Court identified certain procedural safeguards which must precede an in-custody interrogation. *Miranda*, 384 U.S. at 478–79. In particular, a person who has been taken into custody, or deprived of his freedom in any significant way, must be informed that he has the right to remain silent and that he has the right to have an attorney present during questioning. *Id*.

The Supreme Court has explained that in the context of *Miranda*, the word "custody" is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). In determining whether a person is "in custody" for purposes of *Miranda*, the Supreme Court has held that "[t]wo discrete inquiries are essential: first, what are the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The "ultimate inquiry" is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id*. If there was, *Miranda* warnings are required.

The Supreme Court has also explained that this "freedom-of-movement" inquiry requires a reviewing court to "examine 'all of the circumstances surrounding the interrogation.'" *Howes*,

565 U.S. at 509 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam)).

Relevant factors include "the location of the questioning, its duration, statements made during

the interview, the presence or absence of physical restraints during the questioning, and the

release of the interviewee at the end of the questioning." *Id*. (internal citations omitted); *see also*

*United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002).

The Supreme Court has made clear, however, that "[n]ot all restraints on freedom of

movement amount to custody for purposes of *Miranda*." *Id*. In *Howes*, a case which involved the

questioning of a state prisoner about events that occurred outside prison, the Supreme Court

observed that "[w]e have 'declined to accord talismanic power' to the freedom-of-movement

inquiry, and have instead asked the additional question whether the relevant environment present

the same inherently coercive pressures as the type of station house questioning at issue in

*Miranda*." *Id*. (citing *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984)). The *Howes* Court went

on to explain that "standard conditions of confinement and associated restrictions on freedom

will not necessarily implicate the same interests that the Court sought to protect when it afforded

special safeguards to persons subjected to custodial interrogation. Thus, service of a term of

imprisonment, without more, is not enough to constitute *Miranda* custody." *Id*. at 512.

Because the *Miranda* custody test is an objective test, "the subjective views harbored by

either the interrogating officers or the person being questioned" are irrelevant. *See Stansbury*,

511 U.S. at 323. "The test, in other words, involves no consideration of the 'actual mindset' of

the particular suspect subjected to police questioning." *J.D.B. v. North Carolina*, 564 U.S. 261,

271 (2011) (citation omitted).

Here, the state court of appeals rejected Petitioner's *Miranda* claim in his PRP. The court

determined that, although he was confined on other charges, Petitioner was not in *Miranda*

1  custody and, therefore, police did not subject him to a custodial interrogation. Specifically, the

2  court concluded,

> Calo first argues that the trial court erred when it concluded that Calo was not in custody during the February 22 interview.[ ] He argues that the fact he was in custody on other charges and not free to leave establishes he was in custody for purposes of *Miranda* when he talked to the officers on February 22.[ ] We disagree.
>
> The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself, or be deprived of life, liberty, or property without due process of law." "In *Miranda*, . . . the Supreme Court established a conclusive presumption that all confessions or admissions made during a custodial interrogation are compelled in violation of the Fifth Amendment's privilege against self-incrimination." *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 682, 327 P.3d 660 (2014) (emphasis added), abrogated on other grounds by *State v. Gregory*, ___ Wn.2d ___, 427 P.3d 621 (2018). The State may overcome this presumption by "showing that law enforcement officials informed the suspect of his or her right to remain silent and right to an attorney and that the suspect knowingly and intelligently waived those rights." *Cross*, 180 Wn.2d at 682. But the right to *Miranda* warnings attaches only when there is a custodial interrogation. *State v. Templeton*, 148 Wn.2d 193, 208, 59 P.3d 632 (2002). "When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation," including "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." *Howes v. Fields*, 565 U.S. 499. 514, 132 S. Ct. 1181, 182 L.Ed.2d 17 (2012).
>
> Relying on *State v. Sargent*, 111 Wn.2d 641, 648, 762 P.2d 1127 (1988), Calo argues that the critical inquiry here is whether his freedom of movement was restricted and that during the February 22 interview he was in custody because he could not simply walk away from the officers and terminate the conversation. In *Sargent*, our Supreme Court concluded that Sargent was in a custodial setting when he was locked in one side of a booth in the King County Jail's visiting area during a presentence interview conducted by a probation officer. 111 Wn.2d at 649. The court stated that "[t]he critical inquiry" was "whether [the defendant's] freedom of movement was restricted" and concluded that the fact Sargent, who was already in custody, was in jail and locked in an interview booth were "restraints on his freedom of movement" sufficient to "constitute custody for *Miranda* purposes." *Sargent*, 111 Wn.2d at 649.
>
> But our Supreme Court more recently explained in *State v. Warner* that "[w]hen dealing with a person already incarcerated, 'custodial' means more than just the normal restrictions of freedom incident to incarceration." 125 Wn.2d 876, 885, 889 P.2d 479 (1995). To establish a "custodial" relationship when the defendant is

already incarcerated, "[t]here must be more than the usual restraint." *Warner*, 125 Wn.2d at 885.

In determining whether there was more than the usual restraint, we find *Howes* helpful. In *Howes*, the Supreme Court expressly rejected the premise that a prisoner is always in custody for purposes of *Miranda* if he is taken aside and questioned about events that occurred outside the prison walls. 565 U.S. at 508. Instead, as noted above, the Court held that "[w]hen a prisoner is questioned, the determination of custody should focus on all the features of the interrogation," including "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." *Howes*, 565 U.S. at 514. The ultimate goal is to protect the defendant from "circumstances that are thought generally to present a serious danger of coercion." *Howes*, 565 U.S. at 508-09.

Here, law enforcement did not "summon" Calo to the interview on its own accord. Rather, Calo initiated the February 22 contact with the officers and spoke to them against his counsel's advice. Although Calo was not free to simply walk away because he was in custody on other matters, the police did not interrogate Calo; instead, Calo volunteered his statements. And his restraint was no more than what was required because of his preexisting status as a prisoner and the need to protect Calo from the other prisoners being aware that he was speaking to law enforcement.

Furthermore, the tone of the interview was not that of an interrogation – Calo sought out the officers and freely offered information about the murder and other matters without being directed to by the officers. And there was nothing indicating that Calo could not have chosen to end the interview at any time without any consequence other than being returned to his original custody status. Moreover, it was clear that the officers talked to Calo at the police station in an attempt to prevent other prisoners from knowing that Calo was speaking to them, not in order to exert extra pressure on Calo.

Additionally, the interview did not present a serious danger of coercion. Calo argues that the only way he could negotiate his way out of custody on the Pierce County and Lakewood matters was to cooperate with the Lakewood officers. But belief that cooperation might lead to more lenient treatment is not the type of compulsion contemplated in *Miranda*. *Warner*, 125 Wn.2d at 884.

Accordingly, we hold that the trial court did not err when it found that Calo was not in custody for purposes of *Miranda* protections during the February 22 interview.

Dkt. 8-1, Ex. 11, at 215–18 (footnotes omitted).

Petitioner fails to demonstrate that the state court's adjudication of his *Miranda* claim was contrary to, or constituted an unreasonable application of, clearly established federal law. The state court applied the proper standard in assessing whether Petitioner was "in custody" for purposes of *Miranda* at the time of his initial interviews with police and reasonably concluded that he was not. This conclusion is supported by the record of the pretrial hearing regarding the interviews in question and related background, as well as the trial court's findings thereafter. Specifically, as set forth by the state court of appeals, the evidence before the trial court was as follows:

### A. CrR 3.5 Hearing

Before trial, Calo move to suppress the statements he made during the February 22, March 18, March 26, and June 21 interviews. Calo argued that his statements should be suppressed because Harmell and Fay provided ineffective assistance of counsel by "encourage[ing] [sic] him to submit to a custodial interrogation providing information about involvement in a murder without ever advising him of the risks and possible consequences." CP at 1. He further argued that the statements were inadmissible because (1) he was in custody when he made the statements and was not advised of his *Miranda* rights and (2) despite having probable cause, the officers delayed his arrest in order to obtain his statements.

Detective Bunton, Investigator Catlett, Fay, Harmell, High, and Pierce County Deputy Prosecutor Sven Nelson testified at the suppression hearing. The video and audio tapes of the four interviews were played for the trial court.

In the video of the February 22 interview, Detective Bunton and Investigator Catlett heard from Calo about his involvement in drug trafficking with several individuals, including Yeto and Gerardo Hernandez-Sandoval, whom Calo knew as Borrego. Calo stated that he had been in jail for identity theft shortly before the murder and that he ended up being confined with Borrego. Without prompting from the officers, Calo told them that Borrego had asked him to tell Yeto that Borrego wanted Hidalgo-Mendoza and anyone else present in the house at the same time to be killed.

Calo told officers that he communicated Borrego's message to Yeto after Yeto arranged for Calo's bail and release. Calo also stated that Yeto called him the night of the murder and asked Calo to send someone to pick him (Yeto) up in Chocolate City. Yeto also called Calo that day and threatened to kill Calo if he contacted the police.

1

2       The video showed that although the February 22 interview was held in a secured interview room, Calo was not physically restrained during the interview. The

3  interview had a conversational tone, and although the officers asked Calo follow-up questions to clarify what he had said and the timeline and to confirm the

4  identities of the people involved, the officers did not generally direct the conversation. In addition to talking about what he knew about the murder, Calo

5  stated that he wanted his current felony charge dropped because he wanted to retain his right to have firearms so he could protect himself.

6       Calo also expressed concern about being sent back to jail after talking to the officers; he asked that they not contact him at the jail and that they get him out of

7  the jail as soon as possible. At the end of the interview, Calo asked the officers if he could smoke, and the officers responded that he could not smoke in the interview

8  room but that they would arrange it so he could smoke and provide him with a cigarette in a few minutes.

9
     Based on these facts and the facts[ ] set out above in section I.B., *supra*, the trial

10  court admitted Calo's February 22, March 18, March 26, and June 21 statements.[ ]

11  Dkt. 8-1, Ex. 11, at 209–11 (footnotes omitted); *see also* Dkt. 44-1, Ex. 46.

12       Under AEDPA, the state court's factual finding that Petitioner was not "in custody" is

13  presumed correct, 28 U.S.C. § 2254(e)(1), and Petitioner offers nothing here to rebut that

14  presumption. *See* Dkt. 42, at 24–31. Further, looking to the totality of the circumstances, the

15  Court concludes that the state court of appeals' decision that Petitioner was not in custody during

16  the initial interviews was not objectively unreasonable. As the Supreme Court has found, state

17  courts are to be given even "more leeway" in cases like this one, where the rule is general in

18  nature, requiring a case-by-case assessment based on the totality of the circumstances.

19  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *Smith v. Clark*, 612 F. App'x 418, 420–21

20  (9th Cir. 2015). Accordingly, the Court recommends that habeas relief as to this part of Ground 1

21  be denied.

22

23

24

ii.  Right to counsel

In connection with Ground 1, Petitioner also argues that police deliberately thwarted his right to counsel, under both the Fifth and Sixth Amendments, when they continued to interview him outside the presence of counsel. Dkt. 42 at 31–33. Respondent asserts that the state court reasonably determined that the questioning did not violate the Fifth or Sixth Amendments because Petitioner was not in custody for purposes of *Miranda* and police were interviewing him about an uncharged crime. Dkt. 43 at 29–32.

The state court of appeals held,

> Calo next argues that the February and March interviews violated his right to counsel under both the Fifth and Sixth Amendments to the United States Constitution. He asserts that the officers "intentionally circumvented [his] Fifth Amendment right to counsel by never advising him of his *Miranda* rights." Corrected Br. of Appellant at 26. He also asserts that the officers violated his Sixth Amendment right to counsel by continuing to interview him despite knowing that he was represented by counsel and that his counsel did not want the officers to question him. We disagree.
>
> As to Calo's Sixth Amendment[ ] claim, the United States Supreme Court confirmed that the Sixth Amendment right to counsel is "offense specific." *Texas v. Cobb*, 532 U.S. 162, 167–68, 121 S. Ct. 1335, 149 L. Ed. 2d 321 (2001) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S. Ct. 2204, 115 L. Ed. 2d. 158 (1991)). That right does not attach to an uncharged offense unless the uncharged offense is "considered the same offense under the *Blockburger* test." *Cobb*, 532 U.S. at 173 (citing *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)). Additionally, a defendant cannot invoke the Sixth Amendment right to counsel until a prosecution is commenced "'at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *McNeil*, 501 U.S. at 175 (internal quotation marks omitted) (quoting *United States v. Gouveia*, 467 U.S. 180, 188, 104 S. Ct. 2292, 81 L. Ed. 2d 146 (1984)).
>
> Here, the officers questioned Calo about matters that were entirely unrelated to the charges for which he had counsel. And at the time of the interviews, no prosecution had been commenced on any charges related to the information Calo provided during the interviews. Accordingly, Calo [h]ad no Sixth Amendment right to counsel in relation to the new charges. Thus, the officers' questioning of him not circumvent his Sixth Amendment right to counsel. [court footnote: In his SAG, Calo also appears to assert that he did not voluntarily waive his Sixth Amendment

right to counsel. But as discussed in this section, the Sixth Amendment right to counsel is offense specific and does not apply here.]

Citing to *Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985), and *State v. Everybodytalksabout*, 161 Wn.2d 702, 708, 166 P.3d 693 (2007), Calo argues that "[o]nce the right to counsel has attached, the State is prohibited from knowingly circumventing that requirement, and from deliberately eliciting information in contravention of that requirement." Corrected Br. of Appellant at 27. But these cases are not persuasive because, unlike here, the information solicited during the contacts with law enforcement at issue in *Moulton* and in *Everybodytalksabout* was used in the matters in which the defendants' Sixth Amendment right to counsel had attached. *See Moulton*, 474 U.S. at 166–67; *Everybodytalksabout*, 161 Wn.2d at 705–06.

As to Calo's Fifth Amendment claim, that claim rests on his assertion that he was entitled to *Miranda* warnings. But as discussed in sections I.B. and I.C. of this analysis, *supra*, Calo was not entitled to *Miranda* warnings. Because he was not entitled to *Miranda* warnings during the February and March interviews, the officers did not circumvent his Fifth Amendment right to counsel when they conducted those interviews.

Dkt. 8-1, Ex. 11, at 219–21 (some footnotes omitted).

As to a violation of his Fifth Amendment right to counsel, Petitioner argues that police violated this right by not advising him that he had a right to remain silent while he was subjected to a custodial interrogation. Dkt. 42 at 32. Respondent counters that Petitioner fails to show how the state court decision that he was not entitled to *Miranda* warnings was an unreasonable application of clearly established federal law. Dkt. 43 at 29, 31–32.

Again, the Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The right against self-incrimination applies to the States through the Fourteenth Amendment. *Malloy*, 378 U.S. at 6. To protect the right against self-incrimination, the Supreme Court has established procedural safeguards that require police to advise a person of the right prior to commencing a custodial interrogation. *Miranda*, 384 U.S. at 478–79. Custodial interrogation is "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his

1  freedom of action in any significant way.'" *Thompson*, 516 U.S. 99, 107 (1995) (quoting *Oregon*

2  *v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). Prior to custodial interrogation, the police

3  must advise the person of the right to remain silent and of the right to the presence of an attorney

4  during questioning. *Miranda*, 384 U.S. at 479. If the suspect unequivocally invokes the right to

5  remain silent or requests counsel, the interrogation must cease. *Id*. at 474.

6      The record indicates that Petitioner's statements to police were not the result of custodial

7  interrogation. Petitioner initiated the interviews, asked his attorney from his Lakewood case to

8  put him in contact with the investigating officers, and then met with the officers against the

9  advice of that counsel. Dkt. 44-1, Ex. 46, at 468. He spoke to the officers willingly and never

10 invoked his right to remain silent. *Id*. Thus, the state court reasonably determined that Petitioner

11 was not entitled to *Miranda* warnings and therefore police did not circumvent his Fifth

12 Amendment right to counsel during the initial interviews. Therefore, the state court decision was

13 neither contrary to, nor an unreasonable application of, clearly established federal law.

14 Accordingly, habeas relief as to this portion of Ground 1 of the Amended Petition should be

15 denied.

16      Turning to Petitioner's Sixth Amendment right to counsel claim, Petitioner argues that

17 his right to counsel was violated when he was questioned by police without counsel present. Dkt.

18 42 at 32–33. Specifically, Petitioner states that he had two attorneys representing him in other

19 criminal matters at the time and that police did not notify counsel before questioning him on this

20 case. *Id*. at 33.

21      "The Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy

22 the right . . . to have the Assistance of Counsel for his defence [sic]." *Texas v. Cobb*, 532 U.S.

23 162, 167 (2001) (internal quotations and alterations omitted). The Supreme Court has explained:

24

1    The Sixth Amendment right [to counsel] . . . is offense specific. It cannot be invoked
     once for all future prosecutions, for it does not attach until a prosecution is
2    commenced, that is, at or after the initiation of adversary judicial criminal
     proceedings – whether by way of formal charge, preliminary hearing, indictment,
3    information, or arraignment.

4    *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (citations and internal quotation marks omitted).

5    A defendant has "a right to counsel only on the offenses for which he had been indicted, and on

6    any other offenses that constitute[s] the 'same offense' under the *Blockburger* test." *United*

7    *States v. Danielson*, 325 F.3d 1054, 1066 (9th Cir. 2003), *as amended* (May 19, 2003).[1]

8        In finding Petitioner's right to counsel was not violated when Petitioner was questioned

9    during the initial interviews, the state court of appeals stated,

10       Here, the officers questioned Calo about matters that were entirely unrelated to the
         charges for which he had counsel. And at the time of the interviews, no prosecution
11       had been commenced on any charges related to the information Calo provided
         during the interviews. Accordingly, Calo [h]ad no Sixth Amendment right to
12       counsel in relation to the new charges. Thus, the officers' questioning of him did
         not circumvent his Sixth Amendment right to counsel.[]

13   Dkt. 8-1, Ex. 11, at 220 (footnote omitted).

14       The state court record in this case shows Petitioner spoke with police prior to being

15   charged with murder and related charges. *See* Dkt. 44-1, Ex. 46, at 468. Further, the murder and

16   related charges do not constitute the same offense as the driving while license suspended and

17   identity theft charges Petitioner had been facing at the time he made the statements to police

18   during the initial interviews in February and March 2013.

19       As Petitioner had not been charged with the murder and related charges at the time he

20   made the incriminating statements to police during those initial interviews, his right to counsel

21

22   _____

23       [1] In *Blockburger v. United States*, 284 U.S. 299 (1932), the Supreme Court explained that "where the same
     act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine
     whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does
24   not." *Cobb*, 532 U.S. at 173 (internal quotations omitted).

under the Sixth Amendment had not attached. Therefore, Petitioner fails to demonstrate the state

court's conclusion that Petitioner's right to counsel was not violated when he was questioned by

police during the initial interviews was contrary to, or an unreasonable application of, clearly

established federal law, or was an unreasonable determination of the facts in light of the evidence

presented in this case. *See Cobb*, 532 U.S. at 176 (stating the Supreme Court "held that a

defendant's statements regarding offenses for which he had not been charged were admissible

notwithstanding the attachment of his Sixth Amendment right to counsel on other charged

offenses"); *Maine v. Moulton*, 474 U.S. 159, 180 (1985) ("to exclude evidence pertaining to

charges as to which the Sixth Amendment right to counsel had not attached at the time the

evidence was obtained, simply because other charges were pending at that time, would

unnecessarily frustrate the public's interest in the investigation of criminal activities").

Accordingly, habeas relief on this portion of Ground 1 of the Amended Petition should be

denied.

       2.  *Ground 3*

     Petitioner next argues that police subjected him to an unconstitutional two-step

interrogation tactic by first engaging in a custodial interrogation without *Miranda* warnings and

then subjecting him to further interrogation after he had already confessed. Respondent counters

that, because this claim relies on the premise that the initial interviews were custodial, the state

court reasonably rejected it. The Court agrees.

     Relying on its finding that Petitioner was not in custody for purposes of *Miranda* during

the initial interviews, the state court of appeals concluded,

> Relying on *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L.Ed.2d.
> 543 (2004), Calo argues that the trial court should have suppressed his statements
> to the officers because they used an impermissible two-step interrogation process.
> A two-step interrogation process involves law enforcement officers questioning a

suspect during a custodial interrogation without providing *Miranda* warnings until the suspect confesses and then obtaining a *Miranda* waiver and continuing the interview to re elicit the confession. *See State v. Hickman*, 157 Wn. App. 767, 772, 238 P.3d 1240 (2010).

Although *Seibert* addresses the two-step interrogation process, the *Seibert* Court presumed the key factor here, whether the defendant was in custody for purposes of *Miranda*. *See United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1129–30 (9th Cir. 2005) (citing *Siebert*, 542 U.S. at 603)). Because, as discussed above in section I.B, *supra*, Calo was not in custody for purposes of *Miranda* during the February interview, Calo does not challenge the trial court's conclusions that he was not in custody during the March interviews, [footnote omitted] and Calo was advised of his *Miranda* warnings at the beginning of the June 21 interview, Seibert is not instructive.

Calo also relies on *United States v. Williams*, 435 F.3d 1148 (9th Cir. 2006), and *Hickman*. But as in *Seibert*, the defendants in *Williams* and *Hickman* were in custody for purposes of *Miranda* when the interrogations at issue in those cases took place. *Williams*, 435 F.3d at 1150 n.1; *Hickman*, 157 Wn.App. at 770–71. Here, Calo was not in custody for purposes of *Miranda* on the relevant crimes.

2.   INTERROGATION

Citing *United States v. Booth*, 669 F.2d 1231 (9th Cir. 1981), and *United States v. Moreno-Flores*, 33 F.3d 1164 (9th Cir. 1994), Calo also appears to assert that he was entitled to *Miranda* warnings because the officers' questioning was an interrogation. But again, whether the interviews were interrogations is irrelevant unless Calo can establish that he was in custody. As explained above, we disagree that he was subjected to custodial interrogation.

3.   CUSTODY REQUIREMENT

Calo also asserts that under *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), a custodial interrogation is not required. But unlike here, at the time of the relevant statements, the defendant in *Massiah* had already been arrested and indicted and had retained counsel. 377 U.S. at 202, 205. Because Calo was not charged with the relevant crimes or in custody for those crimes when he made the statements at issue here, *Massiah* does not apply, and Calo is not entitled to relief on this ground.

Because Calo was not in custody for purposes of *Miranda* on the relevant crimes during the first three interviews and was advised of his *Miranda* rights before the officers questioned him during the fourth interview, the trial court did not err when it denied Calo's motion to suppress his statements resulting from the four interviews.

1   Dkt. 44-1, Ex. 11, at 243–45.

2        The state court's decision here is neither contrary to, nor an unreasonable application of,

3   clearly established federal law. Nor did the state court's proceeding result in a decision that was

4   based on an unreasonable determination of the evidence presented. Petitioner's reliance on

5   *Missouri v. Seibert*, 542 U.S. 600 (2004), for this Ground does not alter the Court's analysis.

6        *Seibert* addressed the inadmissibility of a post-warning confession obtained where the

7   interrogating officer used a two-step interrogation tactic, "termed 'question-first,' that called for

8   the deliberate with-holding of the *Miranda* warning until the suspect confessed, followed by a

9   *Miranda* warning and a repetition of the confession already given." *United States v. Williams*,

10  435 F.3d 1148, 1154 (9th Cir. 2006) (citing *Seibert*, 542 U.S. at 604[2]). A plurality of the

11  Supreme Court concluded that the post-warning statements were inadmissible given that "the

12  facts here, . . . by any objective measure reveal[ed] a police strategy adapted to undermine the

13  *Miranda* warnings." *Id.* at 616 (footnote omitted). Key for the plurality was whether the *Miranda*

14  warning was effective. To determine whether the warning was effective, "the focus is on facts

15  apart from [the interrogator's] intent that show the question-first tactic at work." *Id.* at 616–17

16  n.6. "Because the facts in *Seibert* did not 'reasonably support a conclusion that the warnings

17  given could have served their purpose,' the plurality held that Seibert's postwarning statements

18  were inadmissible." *Williams*, 435 F.3d at 1156 (quoting *Seibert*, 542 U.S. at 617). In his

19  concurrence, Justice Kennedy indicated that the plurality's "test cuts too broadly." *Seibert*, 542

20  U.S. at 622 (Kennedy, J., concurring). Instead, Justice Kennedy "would apply a narrower test

21

22  _____

23      [2] The interrogating officer in *Seibert* testified he "made a 'conscious decision' to withhold *Miranda*
    warnings, this resorting to an interrogation technique he has been taught: question first, then give the warnings, and

24  then repeat the question 'until I get the answer that she's already provided once.'" *Seibert*, 542 U.S. at 605–06.

1    applicable only in the infrequent case . . . in which the two-step interrogation technique was used

2    in a calculated way to undermine the *Miranda* warning." *Id.*

3        When resolving a claim made pursuant to *Seibert*, the Ninth Circuit has applied Justice

4    Kennedy's test. *See Williams*, 435 F.3d at 1157 ("Ordinarily, '[w]hen a fragmented Court

5    decides a case and no single rationale explaining the result enjoys the assent of five Justices, the

6    holding of the Court may be viewed as that position taken by those Members who concurred in

7    the judgments on the narrowest grounds.'" (quoting *Marks v. United States*, 430 U.S. 188, 193

8    (1977)).

9        *Seibert* does not apply to Petitioner's case. Unlike in *Seibert*, Petitioner was not subjected

10   to custodial interrogation during his initial interviews with police. *See supra*, at Section B.1.i.

11   Based on the evidence of record, the Court finds the state court's decision was not unreasonable.

12   It is clear that the state court understood *Miranda* and the concept of custodial interrogation. The

13   facts discussed above demonstrate that Petitioner initiated the conversation with officers about

14   the facts related to this case, voluntarily accompanied them to the police station, and made his

15   statements voluntarily. *See supra*, at Section B.1.i. Thus, the state court's decision that the initial

16   interviews were not custodial is not unreasonable and, as such, the finding that police could not

17   have engaged in the two-step interrogation strategy explained in *Seibert* was likewise not

18   unreasonable. Accordingly, habeas relief as to Ground 3 of the Amended Petition should be

19   denied.

20       C.   Ineffective Assistance of Trial Counsel (Grounds 2 and 5)

21       Petitioner asserts two claims of ineffective assistance of trial counsel in the Amended

22   Petition. In Ground 2, Petitioner alleges he received ineffective assistance when counsel, namely

23   Mr. Harmell, failed to properly advise Petitioner of the potential consequences of speaking with

24

1  police during the initial interviews without the presence of counsel. Dkt. 42 at 33–41. In Ground

2  5, Petitioner alleges trial counsel was ineffective for failing to object to Mr. Mendoza-Ortega's

3  testimony that he had bailed Petitioner out of jail on multiple occasions.

4      The primary question when reviewing a claim of ineffective assistance of counsel under

5  AEDPA is not whether counsel's representation was deficient, or whether the state court erred in

6  analyzing the claim, but whether the state court adjudication of the claim was unreasonable.

7  *Schriro v. Landrigan*, 550 U.S. 465, 472–73 (2007). Because counsel has wide latitude in

8  deciding how best to represent a client, review of counsel's representation is highly deferential

9  and is "doubly deferential when it is conducted through the lens of federal habeas." *Yarborough*

10  *v. Gentry*, 540 U.S. 1, 5–6 (2003).

11      In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court created a two-part

12  test for determining whether a defendant received ineffective assistance of counsel. First, a

13  defendant must demonstrate his attorney's performance was deficient, which requires showing

14  "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by

15  the Sixth Amendment." *Id.* at 687. Second, a defendant must demonstrate the deficient

16  performance prejudiced the defense to such a degree the results of the trial cannot be trusted. *Id.*

17      Under the first prong, the reasonableness of an attorney's performance is to be evaluated

18  from counsel's perspective at the time of the alleged error and in light of all the circumstances.

19  *Id.* at 690. The petitioner must carry a heavy burden, as "reviewing courts must indulge a strong

20  presumption that counsel's conduct falls within the wide range of professional assistance; that is,

21  the defendant must overcome the presumption that, under the circumstances, the challenged

22  action might be considered sound trial strategy." *Id.* at 689 (citation omitted).

23

24

1   Under the prejudice prong, a petitioner must establish there is a reasonable probability the

2   results would have been different but for counsel's deficient performance. *Kimmelman v.*

3   *Morrison,* 477 U.S. 365, 375 (1986); *Strickland,* 466 U.S. at 696. "A reasonable probability is a

4   probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

5       1.   *Ground 2*

6   In Ground 2, Petitioner argues Mr. Harmell was ineffective for failing to stop Petitioner

7   from talking with the police during the initial interviews. The state court of appeals rejected this

8   claim because Petitioner failed to demonstrate that the right to counsel was attached at the initial

9   interviews and, therefore, could not show a violation of the right to effective assistance of

10  counsel. The state court held,

11      Claims of ineffective assistance of counsel are generally rooted in the Sixth
        Amendment. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). But, as noted
12      above, the Sixth Amendment is offense specific and comes into play "only at or
        after the time that adversary judicial proceedings have been initiated against [the
13      defendant]." [*United States v.*] *Gouveia*, 467 U.S. 180, 187–88 [(1984)]. Because
        the interviews at issue took place before the start of any proceedings against Calo
14      related to those interviews and the interviews did not relate to the charges that
        Harmell represented him on, Calo had no Sixth Amendment right to effective
15      assistance of counsel from Harmell at the time of the interviews as it relates to the
        charges now at issue.

16
        Furthermore, the Fifth Amendment right to assistance of counsel does not
17      attach unless the interrogation is a custodial interrogation. *Miranda*, 384 U.S. at
        469–70. Because Calo has not shown that the February 22 interview was a custodial
18      interrogation, [footnote omitted] Calo fails to establish ineffective assistance in
        violation of the Fifth Amendment as it relates to the charges now at issue because
19      his right to counsel in this matter had not attached.

20      Calo relies on *Commonwealth v. Celester*, 473 Mass. 553, 45 N.E.3d 539
        (2016). But unlike here, in *Celester* there was no dispute that interrogation at issue
21      as a custodial interrogation. *See* 473 Mass. at 572. Here, in contrast, Calo has not
        established that the first three interviews were custodial interrogations and he
22      waived his right to counsel during the June 21 interview.

23  Dkt. 8-1, Ex. 11, at 221–22.

24

1    Here, there is no basis to conclude that counsel was ineffective for failing to prevent

2    Petitioner from talking to police during the initial interviews because Petitioner has not

3    demonstrated that the right to counsel attached at those interviews. Consistent with federal law,

4    the state court of appeals reasonably found that Petitioner's underlying claims that the Fifth and

5    Sixth Amendment rights to counsel did not apply because, respectively, he was not in custody

6    for purposes of *Miranda* and he was not questioned about a charged offense. *See supra*, at

7    Section B.1.i. Where a defendant has no constitutional right to counsel, he cannot be deprived of

8    the effective assistance of counsel. *Wainwright v. Torna*, 455 U.S. 586, 587 (1982). As Petitioner

9    had no constitutional right to counsel during the initial interviews, he could not be deprived of

10    the effective assistance of counsel when counsel allegedly failed to prevent him from

11    participating in those interviews. Accordingly, habeas relief as to Ground 2 of the Amended

12    Petition should be denied.

13        2.   *Ground 5*

14    In Ground 5, Petitioner argues that trial counsel was ineffective for failing to object to the

15    testimony of Mr. Mendoza-Ortega, who was also known as "Yeto," that he had bailed Petitioner

16    out of jail. The state court of appeals applied the *Strickland* standard in determining that counsel

17    was not ineffective here.  Dkt. 8-1, Ex. 11, at 225; 226–28. Specifically, the court found:

18        Calo further contends that he received ineffective assistance of counsel because
his trial counsel did not object to Yeto's testimony that he had paid Calo's bail three

19    times. Calo contends that this was impermissible ER 404(b) testimony. Calo fails
to show that he is entitled to relief on this ground.

20
    a.   ADDITIONAL FACTS

21
    When testifying about his relationship with Calo, Yeto testified that he

22    eventually had issues with Calo in part because Calo would get arrested for driving
without a license and Yeto would have to bail Calo out of jail. Yeto specifically

23    testified about helping Calo's friends bail him out of jail in October 2012. When
the State later asked Yeto how many times he paid bail for Calo, Yeto responded

24

that he had bailed Calo out three times. Defense counsel did not object to this testimony.

     b.  Discussion

ER 404(b) prohibits a court from admitting '[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith.'" *State v. Foxhoven*, 161 Wn.2d 168, 174-75, 163 P.3d 786 (2007) (alterations in original) (quoting ER 404(b)). Although ER 404(b) "prohibit[s] admission of evidence designed simply to prove bad character; [ER 404(b)] is not intended to deprive the state of relevant evidence necessary to establish an essential element of its case." *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995). Thus, evidence of other bad acts may be admissible for other purposes, such as proof of motive, intent, or preparation. ER 404(b); *Foxhoven*, 161 Wn.2d at 175. But before admitting ER 404(b) for another purpose, the trial court must weigh the probative value against its prejudicial effect. *Foxhoven*, 161 Wn.2d at 175.

Evidence that Yeto had bailed Calo out of jail suggests that Calo had prior arrests, which would qualify as evidence of other crimes and is, therefore, potentially subject to ER 404(b). But the evidence that Yeto had paid Calo's bail three times was not admitted to prove Calo's bad character. Instead, it was admitted to establish the relationship between Yeto and Calo.

And it does not appear that the admission of the evidence that Yeto had bailed Calo out three times was prejudicial. Even without the references to bail, the jury was aware that Calo had been in jail at least twice before his arrest on the murder, robbery, and burglary charges because there was evidence that Calo was in jail when he claimed to have been given the message to deliver to Yeto – a fact Calo relied on in his own closing argument – and there was evidence that Calo was in jail on other charges when he made his February 22 statement. In addition, other witnesses also testified about assisting Calo with bail. Although Yeto mentioned that he had bailed out Calo three times, it is unlikely this additional reference to bail was prejudicial given the other evidence of Calo's prior arrests.

Furthermore, Yeto testified that he usually had to help Calo with bail because Calo had been jailed on driving-related violations, which is not highly prejudicial.

Because the fact Calo had been bailed out was not admitted to prove action in conformity therewith and this evidence was not unfairly prejudicial, it is unlikely that the trial court would have sustained an objection to the admission of the bail testimony had defense counsel objected. Accordingly, Calo does not establish deficiency. *See In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004) (to establish ineffective assistance of counsel based on a failure to object, the appellant must show "that the proposed objection would likely have been sustained[ ] and that the result of the trial could have been different if the evidence had not been admitted") (footnote omitted).

Dkt. 8-1, Ex. 11, at 226–28.

In his Amended Petition, Petitioner fails to show the state court's consideration of this claim was contrary to or an unreasonable application of federal law. Petitioner fails to support the contention that his counsel's failure to object resulted in assistance falling below an objective standard of reasonableness. "Under *Strickland*, counsel's representation must be only objectively reasonable, not flawless or to the highest degree of skill." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (citing *Strickland*, 466 U.S. at 688–89). Further, "the relevant inquiry under *Strickland* is not what defense counsel should have pursued, but rather whether the choices made by defense counsel were reasonable." *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998). Here, counsel's failure to object to Mr. Mendoza-Ortega's testimony about bailing out Petitioner may have been a reasonable tactical decision, designed to avoid focus of the jury's attention of Petitioner's previous time in jail. Moreover, the state court reasonably concluded that the trial court would have overruled an objection to the bail testimony as it was not unfairly prejudicial. *See* Dkt. 8-1, Ex. 11, at 228. Petitioner takes issue with this conclusion that Mr. Mendoza-Ortega's testimony was not highly prejudicial because he only testified that he bailed Petitioner out of jail for minor traffic violations. Dkt. 42 at 50. Rather, Petitioner claims in his Amended Petition that Mr. Mendoza-Ortega never testified as to why he bailed Petitioner out of jail, only that he did so. *Id*. However, the record belies this assertion. On direct examination, when asked to explain why he said Petitioner was "doing things the wrong way," Mr. Mendoza-Ortega responded, "Well, he would not listen to me. He would drive without a license. He would be pulled over, taken to jail. I had to pay for his bail." Dkt. 44-1, Ex. 62, at 2235–36. As found by the state court, this testimony was admitted to establish the relationship between the two men and was not highly prejudicial in light of other evidence of Petitioner's arrests. *See* Dkt. 8-1, Ex. 11,

1    at 227–28. On habeas review, Petitioner has not provided anything to demonstrate that trial

2    counsel's failure to object here was in error or that the error changed the outcome of the trial.

3    *Strickland*, 466 U.S. at 689. For the reasons stated herein, Petitioner's ineffective assistance of

4    counsel claim based on the failure to object to Mr. Mendoza-Ortega's bail testimony lacks merit

5    and Ground 5 of the Amended Petition should be denied.

6         D.   Prosecutorial Misconduct (Ground 4)

7         Petitioner contends the State violated his right to a fair trial when the prosecutor made

8    inflammatory and prejudicial comments about him during opening statements. The state court

9    denied this claim on the merits.

10        When a prosecutor's conduct is placed in question, unless the conduct impermissibly

11   infringes on a specific constitutional right, the standard of review is the "narrow one of due

12   process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168,

13   181–82 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43 (1974). To obtain relief on a

14   claim of prosecutorial misconduct, a federal habeas petitioner must do more than show that "the

15   prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at

16   180–81. A petitioner must demonstrate that the allegedly improper comments made by the

17   prosecutor "so infected the trial with unfairness as to make the resulting conviction a denial of

18   due process." *Id*. at 181 (quoting *Donnelly*, 416 U.S. at 643). In order to assess a claim that a

19   prosecutor's comments rendered a trial so fundamentally unfair as to deny a petitioner due

20   process, it is necessary to examine the entire proceedings and place the prosecutor's statements

21   in context. *See Greer v. Miller*, 483 U.S. 756, 765–66 (1987). A court may consider whether the

22   prosecutor's comments manipulated or misstated the evidence, whether the trial court gave a

23

24

curative instruction, and the weight of the evidence against the accused. *Darden*, 477 U.S. at 181–82.

Prosecutorial misconduct which rises to the level of a constitutional violation nonetheless provides a basis for federal habeas relief only if the misconduct is deemed prejudicial under the test announced by the Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *See Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004). Under *Brecht*, habeas relief may be granted only if an error had "substantial or injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (1993).

Here, the state court of appeals rejected Petitioner's prosecutorial misconduct claim arising out of the prosecutor's opening statement. The court explained its conclusion as follows:

2. JIGSAW PUZZLE REFERENCES

Calo first contends that the State's references to a jigsaw puzzle analogy was improper because it minimized the reasonable doubt standard. We disagree.

In its opening statement, the State stated that understanding the case based on the evidence presented in the case was similar to putting together a jigsaw puzzle. The State further stated that the opening statement was to provide a roadmap and continued its puzzle analogy by suggesting that the opening statement was akin to having the picture on the box available when working on the puzzle. Calo did not object to this statement.

Even presuming, but not deciding, that this issue was preserved for appeal, this argument fails. Although jigsaw puzzle analogies can be improper when the State attempts to analogize to the burden of proof, [court footnote: *See, e.g.*, *State v. Johnson*, 158 Wn. App. 677, 684, 243 P.3d 936 (2010).] this is not the case here. Here, the State was not referring to jigsaw puzzles in an attempt to explain the burden of proof, but rather as a way of describing the purpose of an opening statement. Accordingly, the State's references to jigsaw puzzles did not amount to prosecutorial misconduct.

3. "[S]PINS A [S]TORY"

Calo next contends that the State's statement that Calo "'spins a story'" improperly expressed the prosecutor's personal belief in Calo's guilt and

improperly vouched "for adverse witness credibility." SAG at 25. Calo is not entitled to relief on this ground.

In its opening statement, after outlining what it intended to show with regard to the charged crimes, the State began to describe Calo's initial contact with the officers investigating the murder:

So, in February, the following year, about three months later, the defendant, [Calo], finds himself in a bit of a pickle, and he wants a favor from the police, and he's got this idea. And his idea is if I go to the Lakewood Police Department and I tell them I've got some tidbits about this murder case that I bet you haven't solved, I'll bet you'll do me a favor. And he's absolutely right.

So in come Detective Les Bunton and Investigator Catlett. And they meet with [Calo] because they've got a cold case on their hands. They've got nowhere to go. And they know it. *And [Calo] spins a story for them.* And what [Calo] tells them –.

11 VRP at 1144–45 (emphasis added). Defense counsel objected to this statement. The trial court sustained the objection and told the jury to "disregard the comment that [Calo] spins a story for them." 11 VRP at 1145.

Calo contends that the State's reference to Calo "'spin[ning] a story'" for Detective Bunton and Investigator Catlett expressed the prosecutor's opinion of Calo's guilt and "improperly vouch[ed] for adverse witnesses['] credibility." SAG at 25. Acknowledging the trial court's curative instruction, Calo further contends that the jury disregarded the court's curative instruction. Because the trial court directed the jury to disregard the challenged portion of the State's opening statement and there is no evidence in the record that the jury failed to follow the court's curative instruction, Calo fails to establish that he is entitled to relief on this ground.

4.   REFERENCES TO CALO'S DRUG USE

Calo also contends that the State's assertion that Calo "'had a problem'" and was drug addicted was improper and amounted to prosecutorial misconduct. SAG at 24–25. Calo is not entitled to relief on this ground.

During its opening statement, the following exchange occurred:

[STATE]: Now, [Calo] *had a problem*. His problem was he was not a good businessman. The drug business can be easy. It can be dangerous, but it can be easy money. But [the] first rule is don't use your own product. If you use your own product, you use too much of it, you cut into your profits. And if you use way more than enough and you really get addicted, you'll

Case 3:19-cv-05904-TL    Document 46    Filed 09/12/22    Page 33 of 37

just cut yourself right down into deep debt and you won't be making any
money and the guy who supplies you will be very angry about that. And
that was where [Calo] got to. [Calo] got –

    [DEFENSE COUNSEL]: I'm going to object at this time, Your Honor.

    THE COURT: I'm going to sustain the objection.

    [DEFENSE COUNSEL]: Thank you.

    [THE STATE]: [Calo] got to a point where he owed Yeto –

    [DEFENSE COUNSEL]: Well, I'm going to ask the Court to order the
jury to disregard his last statement regarding my client's use of drugs.
There's no evidence of that. And, quite honestly, Your Honor, I'm going to
ask the Court to order the prosecutor not to proceed down this line of
argument – or statement line.

    THE COURT: Okay. Jurors, let me say that, as indicated earlier, these
are not facts. You have to determine the facts in this case. This is opening
statement. This is the evidence that the State expects you to find. You may
or may not find that evidence, okay?

    Let me see counsel at sidebar just a second.

                   (Pause in Proceedings)

    THE COURT: Okay. Sorry to interrupt.

    . . . .

    [THE STATE]: Thank you.

    The testimony in this case will show that [Calo] got himself into trouble
with Yeto. [Calo] was deep in debt to Yeto, and you don't do that. So,
eventually, Yeto says I'm cutting you off. I'm not supplying you with dope
anymore. And luckily for [Calo], Yeto wasn't mad enough to do something
more about it than that. So [Calo] goes out and he finds a new source, a guy
named Marteen.

    Now, [Calo] doesn't really change his business ways and eventually
finds himself deep in debt with Marteen as well. I mean, [Calo's] *got a
problem*. Because once Marteen cuts him off, his reputation is going to be
trashed and he's going to have a heck of a time finding somebody to provide
him with dope, which he desperately needs.

    So [Calo] decides I gotta come up with a plan. And his plan is to do
something drastic. He goes to his friend Jiffary Alexander Mendez, who
he's known for many years since they've been in school together some years
ago in this area. [Calo] goes to [Mendez] and he says here's the problem.
And [Mendez] knows all about it because [Mendez] knows all about
[Calo's] drug dealing *and drug usage*. And [Mendez] says I get it. I know
what we need to do. I understand your plan.

11 VRP at 1133–36 (emphasis added).

    Even presuming, but not deciding, that the State's references to Calo's drug use
were improper, Calo does not establish that this argument was prejudicial. To
establish prejudice, Calo must show that "'there is a substantial likelihood [that]
the instances of misconduct affected the jury's verdict.'" *Magers*, 164 Wn.2d at

191 (alteration in original) (quoting *Pirtle*, 127 Wn.2d at 672). Given the nature of this case, it was clear to the jury that Calo was heavily involved in drug activity and that he as indebted to those engaged in the drug business. The reason for that indebtedness, Calo's drug use, was of little importance, and Calo does not show that there was a substantial likelihood that the State's statement referencing his drug use affected the jury's verdict. Accordingly, Calo is not entitled to relief on this ground.

5.  "[H]ARD [O]PENERS"

Calo also generally asserts that this "type[ ] of hard opener[ ]" is intended to secure convictions and may be overly prejudicial. SG at 26. Again, Calo is not entitled to relief on this ground.

The purpose of an opening statement is to allow the State to outline its case and to describe what it intends to prove at trial. *See Magers*, 164 Wn.2d at 191. By its very nature, opening statements are prejudicial to the defendant because they reflect the State's case against the defendant. But if the State goes beyond describing what it intends to prove at trial and makes statements intended to bias or prejudice the jury, the defendant can, as Calo does here, challenge those statements. But the prosecutor did not make statements that were intended to bias or unfairly prejudice the jury and because we address Calo's specific arguments above and he does not identify any additional specific instances of alleged prosecutorial misconduct, we do not address this contention further.

In sum, we hold that Calo's prosecutorial misconduct claims either fail to establish that the State made improper statements or that any improper statements were prejudicial. Accordingly, Calo's prosecutorial misconduct claims fail.

Dkt. 8-1, Ex. 11, at 246–50.

Here, in context with the trial as a whole—especially in light of the evidence presented to the jury of Petitioner's guilt—Petitioner has not shown the prosecutor's comments created a "substantial and injurious effect" on the jury's verdict. *Brecht*, 507 U.S. at 637; *See* Dkt. 44-1, Exs. 59–72.

Turning to Petitioner's specific assertions of prosecutorial misconduct presented to the state courts, first, Petitioner's objections to the prosecutor's use of a "hard opener," generally, and a "jigsaw puzzle" analogy, specifically, were rejected by the state court of appeals because Petitioner failed to establish that these comments were improper at all. Petitioner makes no

argument with respect to the "hard opener" in his Amended Petition but does maintain that the "jigsaw puzzle" analogy was improper. While the state court acknowledged that a jigsaw puzzle analogy can be improperly applied by a prosecutor when discussing the burdens of proof in a trial, it nevertheless found that the prosecutor here was using the analogy to describe the purpose of an opening statement and not the burdens of proof. *See* Dkt. 8-1, Ex. 11, at 246. Petitioner has not offered any evidence or argument to persuade this Court that the state court's decision was not reasonable or that the prosecutor's jigsaw puzzle analogy used in this way, when viewed in context with the entire trial, caused actual prejudice to Petitioner. *See Brecht*, 507 U.S. at 637.

Further, when the prosecutor asserted that Petitioner was "spin[ning] a story," the trial court responded to defense counsel's objection by telling the jury to disregard the statement. *See* Dkt. 8-1, Ex. 11, at 246–47. When the prosecutor made reference to Petitioner's drug use, the trial court promptly provided a curative instruction to the jurors, instructing them that the lawyers' statements are not the facts of the case and rather it is they who are to determine the facts of the case. *See id*. at 247–48. Jurors are presumed to follow their instructions, *see Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)), and nothing in the record before this Court suggests that they did not do so in this instance. Therefore, Petitioner has not shown that the state court's decision here was not reasonable or that the comments, when viewed in context with the entire trial, caused actual prejudice to Petitioner. *See Brecht*, 507 U.S. at 637.

In sum, Petitioner fails to demonstrate that the state court's conclusion with respect to the prosecutor's alleged misconduct during opening statements was contrary to, or constituted an unreasonable application of, clearly established federal law. Habeas relief as to Ground 4 of the Amended Petition should therefore be denied.

III.    **Evidentiary Hearing**

The decision to hold an evidentiary hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* The Court does not find it necessary to hold an evidentiary hearing because, as discussed in this Report and Recommendation, Petitioner's grounds for relief may be resolved on the existing state court record.

IV.    **Certificate of Appealability**

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or would conclude the issues presented in the Amended Petition should proceed further. Therefore,

1    the Court concludes Petitioner is not entitled to a certificate of appealability with respect to any

2    of the grounds for relied in the Amended Petition.

3    **V.        Conclusion**

4        For the above-stated reasons, the Court concludes Petitioner has not shown the state

5    court's adjudication of Grounds 1 – 5 of the Amended Petition was contrary to, or an

6    unreasonable application of, clearly established federal law. Nor was the adjudication an

7    unreasonable determination of the facts in light of the evidence presented in this case. The Court

8    also finds an evidentiary hearing is not necessary. Therefore, the Court recommends the

9    Amended Petition be denied and a certificate of appealability not be issued.

10        Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

11    fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P.

12    6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

13    review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

14    objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

15    *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

16    imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on

17    September 30, 2022, as noted in the caption.

18        Dated this 12th day of September, 2022.

19

20                                                     _____

21                                                     David W. Christel
                                                       United States Magistrate Judge

22

23

24