UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| WILLIAM MANUEL ALVAREZ-CALO, <br><br> Petitioner, <br> v. <br> MIKE OBENLAND, <br><br> Respondent. | CASE NO. 3:19-cv-05904-TL-DWC <br><br> ORDER ON REPORT AND RECOMMENDATION |

Petitioner William Manuel Alvarez-Calo seeks a writ of habeas corpus for relief from a state conviction. This matter comes before the Court on the Report and Recommendation (the "R&R") of the Honorable David W. Christel, United States Magistrate Judge, which recommends denial of the petition. Dkt. No. 46. Having reviewed the R&R, Mr. Alvarez-Calo's objections to the R&R (Dkt. No. 47), and the relevant record, the Court ADOPTS the R&R and OVERRULES Mr. Alvarez-Calo's objections.

ORDER ON REPORT AND
RECOMMENDATION - 1

## I. BACKGROUND

The factual background of this matter is set out at length in various parts of the decision of the Washington State Court of Appeals. *See* Dkt. No. 42-1 at 411–71; *State v. Calo*, No. 49798-8-II, 2018 WL 6819566 (Wash. Ct. App. Dec. 27, 2018); *see also* Dkt. No. 8 (state court record); Dkt. No. 46 at 2–6. The facts relevant to this Order are recounted here.

### A. Pretrial Events

In February 2013, Mr. Alvarez-Calo was facing pending criminal charges in two Washington State jurisdictions. Dkt. No. 42-1 at 413. In Lakewood Municipal Court, he was charged with a misdemeanor driving offense. *Id.* at 106 (indicating charge for "driving [with a] suspended [license]"). There he was represented by Ms. Kristin Fay and her supervisor, Mr. Ken Harmell, both of whom primarily handled misdemeanor matters. *Id.* at 94 (103:21–24), 135–36 (144:25–145:3). In Pierce County Superior Court, Mr. Alvarez-Calo was charged with second degree identity theft (a felony) and third degree driving with a suspended license (a misdemeanor), and he was represented by Ms. Mary Kay High. *Id.* at 413–14.

#### 1. Conversations with Counsel and Outreach to Police

On February 11, 2013, Mr. Alvarez-Calo asked Ms. Fay to "put him in contact with" the officers who were investigating the murder of Jaime Diaz-Solis. Dkt. No. 42-1 at 413. Ms. Fay had not previously assisted a client in a proffer situation. *Id.* at 114 (123:16–18). Mr. Alvarez-Calo told her that he wanted to "provide information on the murder in exchange for the dismissal of his Lakewood and Pierce County cases." *Id.* at 413–14; *but see id.* at 104 (115:10–12) (Ms. Fay: "[H]e, um, volunteered information, what would happen if I got – gave you information, um, on this – and I'm going to summarize this – on this murder."). Ms. Fay continued the Lakewood case so that she could speak to Mr. Harmell and Ms. High. *Id.* at 414. She spoke to Mr. Harmell, who did not attempt to identify or contact Ms. High. *Id.* at 414, 154 (163:2–7).

Ms. Kay attempted to contact Ms. High[1] but ultimately did not speak to her. *Id.* at 414. "Sometime after February 11, Ms. Fay 'caused a message to be sent to Detective [Les] Bunton' about [Mr. Alvarez-Calo's] request." *Id.*; Dkt. No. 8-1 at 63 ¶ 5.

On February 22, 2013, Mr. Alvarez-Calo was transported to the Lakewood Municipal Court for a hearing on the Lakewood matter, for which Mr. Harmell would represent him. Dkt. No. 42-1 at 414. Detective Bunton and Lakewood Police Department Investigator Jason Catlett were present in the courtroom, and they spoke to Mr. Harmell about speaking with Mr. Alvarez-Calo. *Id.*

Mr. Harmell then met with Mr. Alvarez-Calo, along with an interpreter, for 20–30 minutes to discuss whether Mr. Alvarez-Calo should speak with the officers. *Id.* Mr. Harmell told Mr. Alvarez-Calo that it "was a bad idea to talk with detectives" and expressed concern about Mr. Alvarez-Calo's safety given the nature of the information he would provide. *Id.*; Dkt. No. 8-1 at 64 ¶ 9. Mr. Harmell believed there was a risk that Mr. Alvarez-Calo would implicate himself in the murder (Dkt. No. 42-1 at 165 (174:21–25)), but he only asked Mr. Alvarez-Calo if he was "100 percent sure" that the police could not tie him to the murder (*id.* at 166 (175:3–12)). He did not provide advice regarding theories of criminal liability or the possible consequences that could ensue. *See id.* at 163–67. However, Mr. Harmell spent "the bulk of [the] conversation . . . trying to talk [Mr. Alvarez-Calo] out of doing the deal." *Id.* at 167 (176:4–5). Mr. Alvarez-Calo "was not concerned about being implicated and was positive that he would not get caught up with the murder." *Id.* at 414; Dkt. No. 8-1 at 64 ¶ 10. Despite Mr. Harmell's efforts to dissuade him, Mr. Alvarez-Calo agreed to speak to the officers at the police station. Dkt. No. 42-1 at 414.

---

[1] Ms. Fay left a voicemail message for Ms. High about the case and was looking to see if the cases could be resolved together. *See* Dkt. No. 42-1 at 107 (116:4–9), 110 (119:9–18), 112–13 (121:23–122:8).

ORDER ON REPORT AND
RECOMMENDATION - 3

1    At that point, Mr. Harmell gave "a little bit of information" to Detective Bunson and
2    Investigator Catlett to see if Mr. Alvarez-Calo had valuable information; they believed he did.
3    Dkt. No. 42-1 at 151–52 (160:21–161:3). One of the officers then contacted Mr. Sven Nelson,
4    the prosecutor on the Pierce County charges, and put Mr. Harmell on the phone with him. *Id.*
5    at 153 (162:2–4); *see also* Dkt. No. 8-1 at 64 ¶ 13 ("Mr. Harmell . . . subsequently spoke to
6    prosecutors regarding both cases."). Mr. Harmell sought "to get as many cases dismissed as
7    possible," despite knowing "nothing at all" about the felony charges. Dkt. No. 42-1 at 153
8    (162:10–16). He did not attempt to secure immunity for Mr. Alvarez-Calo in exchange for the
9    information (*id.* at 156 (165:3–6)). He did attempt to contact Ms. High regarding resolution of
10   the felony case. *Id.* at 415; Dkt. No. 8-1 at 64 ¶ 14; *but see* Dkt. No. 42-1 at 154 (163:11–13)
11   (testimony by Mr. Harmell that he did *not* attempt to "involve" or identify Ms. High). Mr.
12   Harmell believed that he "had an agreement from a prosecutor that I trusted, that he was going to
13   dismiss the case." *Id.* at 155 (164:6–7).

14        **2.    The February 22 Initial Interrogation**

15        Detective Bunton and Investigator Catlett transported Mr. Alvarez-Calo to the Lakewood
16   Police Station for an interview so that other detainees at the court would not see Mr. Alvarez-
17   Calo speaking to police. Dkt. No. 42-1 at 415, n.5. Mr. Harmell did not accompany Mr. Alvarez-
18   Calo because he "had the rest of the [court] calendar to complete" and because he "did not view
19   [himself] as [Mr. Alvarez-Calo's] attorney any longer" as the Lakewood case was going to be
20   dismissed. *Id.* at 169 (178:17–22).
21        Mr. Alvarez-Calo was in jail clothing, was handcuffed, and was not free to leave because
22   he was in custody on the pending Pierce County charges. *Id.* at 415. At no point prior to or
23   during the interview did the officers advise Mr. Alvarez-Calo of his *Miranda* rights. *Id.* The
24   interview was held in a secured room, though Mr. Alvarez-Calo was not physically restrained

during the interview. *Id.* at 418. "The interview had a conversational tone," and although the officers asked follow-up questions, they "did not generally direct the conversation." *Id.* "[T]here was nothing indicating that [Mr. Alvarez-Calo] could not have chosen to end the interview at any time without any consequence other than being returned to his original custody status." *Id.* at 425. Mr. Alvarez-Calo told the officers about his contacts and involvement with a narcotics cartel, identified people in photographs, and implicated people in the murder.[2] *Id.* at 415. Mr. Alvarez-Calo also stated that he wanted his current felony charge dropped because he wanted to regain his right to have firearms so he could protect himself. *Id.* at 418. He also asked the officers to not contact him at the jail and to "get him out of the jail as soon as possible." *Id.*

Ultimately, Mr. Alvarez-Calo's misdemeanor case in Lakewood was dismissed, and he pleaded guilty to an amended and lesser charge of one count of second degree driving while license suspended in Pierce County. *Id.* at 415. Based on the information he provided to the Lakewood police over the course of multiple interviews, Mr. Alvarez-Calo was arrested for murder and conspiracy. *Id.* at 416.

**B.    The Trial**

At the murder trial, in its opening statement, the prosecution made several statements that are at issue in the petition and about which Mr. Alvarez-Calo objects. Dkt. No. 42-1 at 454–58. First, the prosecution used a "jigsaw puzzle analogy." *Id.* at 454. It stated that "understanding the case based on the evidence presented in the case was similar to putting together a jigsaw puzzle." *Id.* It further stated that the opening statement "was akin to having the picture on the box available when working on the puzzle." *Id.* Mr. Alvarez-Calo did not object to these statements. *Id.*

---

[2] Mr. Alvarez-Calo was also interviewed by officers on March 18, March 26, and June 18. Dkt. No. 42-1 at 415–16. As explained below, the details of those interviews are not relevant to the disposition of this petition. *See infra*, Section III.C.

Second, the prosecution described Mr. Alvarez-Calo as "spin[ning] a story" to Detective Bunson and Investigator Catlett. *Id.* at 454–55. Mr. Alvarez-Calo objected to the statement, and the court instructed the jury to disregard the statement. *Id.* at 455.

Third, the prosecution made repeated references to Mr. Alvarez-Calo's drug use. *Id.* at 455–56. The prosecution stated that Mr. Alvarez-Calo "had a problem" and went on to discuss the "drug business" and addiction. *Id.* Mr. Alvarez-Calo objected, and the court reminded the jury that information in the opening statement is not evidence but merely the expectation of evidence. *Id.* at 456. The prosecution then again stated that Mr. Alvarez-Calo "had a problem" and referred to "drug usage." *Id.*

Over the course of the trial, a variety of evidence was presented, which is summarized by the Washington Court of Appeals. *See* Dkt. No. 42-1 at 419–21; *see also* Dkt. No. 42 at 14–17. The evidence showed that Mr. Alvarez-Calo worked for Mr. Alberto Mendoza Ortega, also known as "Yeto." Dkt. No. 42-1 at 419. Mr. Alvarez-Calo assisted Yeto with drug sales and worked as a mechanic in Yeto's garage. *Id.* At one point, Mr. Alvarez-Calo was arrested, and Yeto, along with other friends of Mr. Alvarez-Calo, bailed him out of jail. *Id.* On the night of the murder, Mr. Alvarez-Calo met with several friends to discuss, among other things, a plan to raid the apartment of Mr. Juan Hidalgo-Mendoza, Yeto's drug supplier, and steal any drugs or money. *Id.* at 419–20. Mr. Alvarez-Calo provided some of them with firearms, and the group went to the apartment anticipating that someone could be home. *Id.* at 420. When they entered the apartment, one of the individuals, Mr. Mazzar Robinson, shot Mr. Diaz-Solis. *Id.* In addition to this information, the prosecution presented evidence of Mr. Alvarez-Calo's multiple interviews with police, in which he admitted, among other things, that he arranged the robbery and murder with Robinson. *Id.* at 420–21.

At one point in the trial, Yeto testified that he eventually had issues with Mr. Alvarez-Calo, who "would get arrested for driving without a license" and who Yeto would then "have to bail . . . out of jail." *Id.* at 434. He also testified that he bailed Mr. Alvarez-Calo out of jail in October 2012 and that he had bailed him out a total of three times. *Id.* at 434–35. Mr. Alvarez-Calo's attorney did not object to the testimony. *Id.* at 435.

Ultimately, the jury found Mr. Alvarez-Calo guilty of first degree felony murder, first degree burglary, and attempted first degree robbery. *Id.* at 421. Mr. Alvarez-Calo subsequently filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See* Dkt. No. 42.

## II.   LEGAL STANDARD

### A.   District Court Review of a Report and Recommendation

A district court has jurisdiction to review a magistrate judge's report and recommendation on "applications for posttrial relief made by individuals convicted of criminal offenses." 28 U.S.C. § 636(b)(1)(B); *see also* Rule 8(b) of the Rules Governing § 2254 Cases ("A judge may . . . refer the petition to a magistrate judge to conduct hearings and to file proposed findings of fact and recommendations for disposition."); Rule 10 ("A magistrate judge may perform the duties of a district judge under these rules, as authorized under 28 U.S.C. § 636."). "Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court." 28 U.S.C. § 636(b)(1)(C); *accord* Rule 8(b). The court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id*.

B.     **Federal Habeas Review**

Under two circumstances, a federal court may grant habeas relief with respect to a claim adjudicated on the merits in state court.

First, a federal court may grant relief if the state adjudication "resulted in a decision that was *contrary to*, or involved an *unreasonable application* of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphases added). A state decision is "contrary to" clearly established Supreme Court precedent if the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law"; or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state decision involves an "unreasonable application" of clearly established Supreme Court precedent if the state court "identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. A decision also involves an "unreasonable application" if the state court "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529 U.S. at 407). Review is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Second, a federal court may grant relief if the state adjudication "resulted in a decision that was based on an *unreasonable determination of the facts* in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) (emphasis added); *accord Juan H. v. Allen*, 408 F.3d 1262, 1270 n.8 (9th Cir. 2005) (observing that the determination must be

"material"). A state court's factual determinations are "presumed to be correct" unless the petitioner rebuts the presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III. DISCUSSION

Mr. Alvarez-Calo raises six objections to the R&R. *See* Dkt. No. 47. Five objections concern the substance of the state court proceedings. *Id.* at 2–15. The final objection concerns the magistrate judge's denial of an evidentiary hearing and a certificate of appealability. *Id.* at 15–16. Defendant Mike Obenland did not respond to any of the objections. The Court considers each objection in turn.

**A.     Objection One: Custodial Status of Original Interrogation**

Mr. Alvarez-Calo argues that the state court unreasonably applied clearly established law in concluding that Mr. Alvarez-Calo was not "in custody" within the meaning of *Miranda v. Arizona*, 384 U.S. 436 (1966), during his first interrogation on February 22.[3] *See* Dkt. No. 47 at 2–6. The objection centers mostly on the contention that the magistrate judge did not fully engage with the Supreme Court's decision in *Howes v. Fields*, 565 U.S. 499 (2012), what Mr. Alvarez-Calo calls "the seminal Supreme Court case analyzing interrogation of a suspect who is already in custody for an unrelated offense." Dkt. No. 47 at 2. In *Fields*, the Supreme Court considered whether a state prisoner, serving a sentence, was "in custody" when he was escorted to a conference room and questioned about an unrelated offense. 565 U.S. at 502. The objection fails because it is premised on a misreading of *Fields* and a misunderstanding of this Court's standard of review.[4]

---

[3] The magistrate judge concluded that the state court's factual finding that Mr. Alvarez-Calo was "in custody" is presumed correct. Dkt. No. 46 at 16. However, the custody determination presents a mixed question of law and fact that qualifies for independent review. *Thompson v. Keohane*, 516 U.S. 99, 112–13 (1995).

[4] Mr. Alvarez-Calo also objects to the magistrate judge's conclusion that he did not have a right to counsel during this interrogation under the Fifth or Sixth Amendments. *See* Dkt. No. 47 at 4–5. As detailed in this section, the state court was reasonable in concluding that he was not in custody, so he did not have a Fifth Amendment right to

### 1. The Supreme Court's Decision in *Fields*

*Fields* is comprised of two parts. First, the Court rejected a purported categorical rule articulated by the court of appeals, in which *Miranda* warnings were required whenever a prisoner was removed from the general prison population and interrogated about conduct outside the prison. *Fields*, 565 U.S. at 505–14. "On the contrary," the Court stated, "we have repeatedly declined to adopt any categorical rule with respect to whether the questioning of a prison inmate is custodial." *Id.* 505. The Court further cautioned, "our decisions do not clearly establish that a prisoner is always in custody for purposes of *Miranda* whenever a prisoner is isolated from the general prison population and questioned about conduct outside the prison." *Id.* at 508. Second, the Court applied the traditional test for custodial status and found that Mr. Fields was not in custody. *Id.* at 514–17. "When a prisoner is questioned," the Court explained, "the determination of custody should focus on all of the features of the interrogation." *Id.* at 514.

Mr. Alvarez-Calo appears to argue that *Fields* sets out a three-factor test for custody involving prisoners serving time, which does not apply to his case and was not distinguished by the magistrate judge. *See* Dkt. No. 47 at 3–4. But *Fields* does no such thing. As Mr. Alvarez-Calo acknowledges in the same breath, the Court "outlined three *rationales* for finding an interrogation of an individual in custody for an unrelated offense is not *necessarily* custodial." Dkt. No. 47 at 3 (emphases added); *see Fields*, 565 U.S. at 511–12. First, questioning a prisoner serving time "does not generally involve the shock that very often accompanies arrest." *Id.* at 511. Second, a prisoner "is unlikely to be lured into speaking by a longing for prompt release." *Id.* Third, a prisoner "knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." *Id.* at 512.

---

counsel. Further, Mr. Alvarez-Calo's Sixth Amendment right to counsel had not yet attached as to the homicide charges. *See infra*, Section III.B.1.

While it could be said that these rationales do not apply cleanly or at all to a typical pretrial detainee, the Supreme Court's reasoning does not clearly establish a test or categorical rule that benefits Mr. Alvarez-Calo. The Supreme Court analyzed these rationales only to explain why the "imprisonment" element of the court of appeals' rule was incorrect. *Id.* Thus, as directed by the Supreme Court, this Court will "focus on all of the features of the interrogation." *Id*. at 514.

### 2.     The State Court's Determination of Custody

Given the facts of the case and existing Supreme Court precedent, it cannot be said that the state court unreasonably conducted the "ultimate inquiry" of a *Miranda* custody determination— namely, whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thompson*, 516 U.S. at 112. "Courts must examine 'all of the circumstances surrounding the interrogation.'" *Fields*, 565 U.S. at 509 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)). Courts also ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id*. "The custody test is general," and courts are given "more leeway" in making a determination of this issue. *Yarborough v. Alvarado*, 541 U.S. 652, 664–65 (2004).

Here, the circumstances of the February 22 interrogation present a mixed picture. Mr. Alvarez-Calo succinctly identifies facts in his favor: "[H]e was taken to a geographically separated police precinct in handcuffs and shackled, placed in a locked room, questioned for over an hour, and never told he had an opportunity to decline speaking at any moment."[5] Dkt. No. 42

---

[5] Mr. Alvarez-Calo also points out that he "has limited English proficiency and severe cognitive difficulties without use of the interpreter." Dkt. No. 47 at 5; *see also* Dkt. No. 42 at 30 (describing himself as "a very suggestible individual with a minimal grasp on the English language relying on a police investigator who was not a certified interpreter to translate for him"). But analysis of *Miranda* custody is limited to the "objective circumstances" of the interrogation and not "the idiosyncrasies of every individual suspect" and how the suspect is affected. *J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011). The Supreme Court has never held that a person's use of an interpreter or a person's cognitive ability is part of an objective *Miranda* analysis.

Moreover, Mr. Alvarez-Calo's attorney used an interpreter during their meeting (Dkt. No. 42-1 at 414), and one of the police officers periodically acted as an interpreter during the February 22 interview (*id*. at 415). Mr. Alvarez-

at 30. He was questioned outside the presence of his attorneys.[6] Dkt. No. 47 at 5. He also demonstrated a belief that his interrogators could affect the duration of his detention, as he asked the officers to get him out of the jail as soon as possible. Dkt. No. 42-1 at 418.

Ultimately, however, there are too many other facts that neutralize or undermine facts in Mr. Alvarez-Calo's favor for this Court to conclude that the state court was unreasonable in its conclusion. For example, even if Mr. Alvarez-Calo did not precisely schedule his contact with police, he initiated the contact by expressing to his attorney a desire to share information with them and thus receive leniency for his then-pending charges. Dkt. No. 42-1 at 413–14; *id.* at 104 (115:10–12). Although his attorney met with him along with an interpreter and advised that it was a bad idea, Mr. Alvarez-Calo proceeded to speak to police against that advice, and he agreed to do so at the police station. *Id.* at 414. This case also does not present "the paradigmatic *Miranda* situation" where someone is taken off the street and hustled straight into questioning. *Fields*, 565 U.S. at 511. Instead, Mr. Alvarez-Calo was already detained on state charges. Dkt. No. 42-1 at 415. Nor was he "'subjected to treatment' in connection with the interrogation." *Fields*, 565 U.S. at 514 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). Again, he was already detained on pending charges. Dkt. No. 42-1 at 415. He was not physically restrained while he spoke with the police. *Id.* at 418. The interview had a conversational tone, and officers

---

Calo does not demonstrate that officers were even aware of any cognitive difficulties. The only indications in the record of cognitive difficulties are discussions in the Court of Appeals decision about his dyslexia in the context of a waiver he signed at a June 21, 2013, interrogation (*id.* at 416), a "Cultural Competency Evaluation" for his counsel (*id.* at 434), and a supplemental brief filed by Mr. Alvarez-Calo in support of the appointment of counsel for his habeas petition (*see* Dkt. No. 21). As there is no evidence that he was asked to read or sign anything at the February 22 interrogation, it does not appear that his cognitive difficulty is relevant to the issues raised in this petition.

[6] Mr. Alvarez-Calo asserts that this is a case "in which police took their suspect for questioning directly from his attorney and paid no regard to a request from another attorney that she did not wish for them to interrogate her client without her present." Dkt. No. 47 at 5. The other attorney referenced is Ms. High, and she informed the police that she wanted to be present for any further discussions with Mr. Alvarez-Calo on February 26, 2013, after the initial interview at issue in this case. *See* Dkt. No. 42-1 at 262 (February 26 email from Ms. High to Bunton).

1  did not generally direct the conversation. *Id.* Together, these circumstances provide a sufficient
2  basis for the state court to conclude that Mr. Alvarez-Calo was not in *Miranda* custody.

3        Mr. Alvarez-Calo does raise a potential distinction in how courts should approach the
4  custodial status of a pretrial detainee in comparison to that of a prisoner serving time post-
5  conviction. This is no trivial issue: most people in local jails in the United States (approximately
6  427,000 people) are awaiting trial. *See* Prison Pol'y Initiative, "Mass Incarceration: The Whole
7  Pie 2023" (Mar. 14, 2023), https://perma.cc/P3M4-GQWH. At least one commentator has
8  recently argued that the logic of *Fields* and a related line of cases should be confined to prisoners
9  serving time and not extended to pretrial detainees. *See* Kit Kinports, *Pretrial Custody and*
10 *Miranda*, 78 Wash. & Lee L. Rev. 725 (2021) (arguing that "pretrial detainees should be deemed
11 to be in *Miranda* custody for the duration of their confinement prior to trial").

12       But on habeas review, the question before the Court is not what the law *should* be in the
13 abstract, or how a case should be decided as a matter of first impression. The question is whether
14 the state court *unreasonably applied* clearly established law. This Court cannot say that it did.
15 The objection is OVERRULED.

16 **B.   Objection Two: Ineffective Assistance of Counsel in Police Interaction**

17       Mr. Alvarez-Calo argues that the state court unreasonably applied clearly established law in
18 concluding that his Sixth Amendment right to the effective assistance of counsel was not violated
19 because the right had not attached. *See* Dkt. No. 47 at 6–10. Mr. Alvarez-Calo highlights the
20 questionable performance of "attorneys who were already representing him" who "arranged for and
21 allowed him to participate in an interrogation with detectives without counsel present." *Id*. at 6. He
22 argues that the attorneys "were unequivocally acting as his attorneys with respect to the homicide"
23 and, "[a]s such, they owed him a professional duty not to render performance falling below an
24 objective standard of reasonableness even if charges had not yet been formally brought." *Id*.

ORDER ON REPORT AND
RECOMMENDATION - 13

The objection fails because existing Supreme Court precedent does not require such a finding, and the state court did not unreasonably refuse to extend precedent to this context. For Mr. Alvarez-Calo to prevail, he would need to show ineffective assistance on either the future homicide charges or the preexisting driving-related charges, but such a finding is not required on these facts.[7]

### 1.     The Homicide Charges

Where a defendant has no constitutional right to counsel, they cannot be deprived of the effective assistance of counsel. *Wainwright v. Torna*, 455 U.S. 586, 587 (1982). The right to counsel is "offense specific." *Texas v. Cobb*, 532 U.S. 162, 167 (2001) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). It "does not attach until a prosecution is commenced." *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 198 (2008) (*quoting McNeil*, 501 U.S. at 175); *see also id.* (holding that a prosecution commences with "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984))).

Here, when Mr. Alvarez-Calo was initially questioned by officers on February 22, a prosecution of the homicide charges had not commenced—indeed, police did not yet know that Mr. Alvarez-Calo would implicate himself. Thus, Mr. Alvarez-Calo did not have a constitutional

---

[7] The unusual facts of this case suggest a kind of gap in the Sixth Amendment, its shield neither broad enough (on the driving-related charges) nor applicable early enough (on the homicide charges) to offer any protection. Indigent defendants cannot afford an attorney to provide comprehensive representation, and under existing precedent, they are not entitled to appointed counsel on cases for which the right to counsel has not attached. But defendants with sufficient financial means are able to retain attorneys to handle all matters that might pose a danger to the client, without regard to the stage of the proceedings. A different model of the right to effective assistance might recognize this gap and provide a remedy to indigent defendants in this situation. *See Johnson v. Zerbst*, 304 U.S. 458, 465 (1938) ("The purpose of the constitutional guaranty of a right to counsel is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights . . . ."); *Maples v. Thomas*, 565 U.S. 266, 283 (2012) (holding in another context that a client cannot be faulted "for failing to act on his own behalf when he lacks reason to believe his attorneys of record, in fact, are not representing him."); *see also* Justin Marceau, *Embracing a New Era of Ineffective Assistance of Counsel*, 14 U. Pa. J. Const. L. 1161 (2012) (describing a "new—non-trial oriented—conception of the right to counsel").

right to counsel with respect to the homicide charges. Mr. Alvarez-Calo insists that his attorneys for the driving charges "were unequivocally *acting as* his attorneys with respect to the homicide" in arranging his contact with police. Dkt. No. 47 at 6 (emphasis added). But Mr. Alvarez-Calo identifies no authority for this novel theory of "acting" counsel that would entitle him to an early attachment of the Sixth Amendment right.

### 2.     The Driving-Related Charges

There is no dispute that at the time Mr. Alvarez-Calo was questioned by officers, his constitutional right to counsel had attached with respect to the pending driving-related charges in Lakewood Municipal Court and Pierce County Superior Court: he was already formally charged and detained on the charges. Dkt. No. 42-1 at 413, 415. The question, then, is whether his attorneys failed to provide effective assistance with respect to those matters.

To show ineffective assistance, a defendant must first show that their counsel's performance was so deficient that it "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Reasonableness is defined in terms of "prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688). A defendant must also show that counsel's deficient performance resulted in prejudice: a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. Like the *Miranda* custody rule, the ineffective assistance rule is a "general standard," and thus "a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

Here, Mr. Alvarez-Calo cannot demonstrate prejudice because he received the leniency he sought in speaking to police: one pending matter was dismissed, and the other resolved with a plea to a charge below the top count. Dkt. No. 42-1 at 415. As to the formal charges for which he

was actually represented by counsel, Mr. Alvarez-Calo received a favorable outcome. He cannot demonstrate that, but for counsel's alleged missteps in arranging contact with police, the result of the Lakewood and Pierce County driving-related cases would have been different. *Strickland*, 466 U.S. at 694. The objection is OVERRULED.

### C.   Objection Three: Subsequent Statements to Police

Mr. Alvarez-Calo concedes that this objection "necessarily rises and falls with the adjudication of whether or not [the] original interrogation was custodial." Dkt. No. 47 at 11. As detailed above, the state court was reasonable in concluding that Mr. Alvarez-Calo was not in custody during the original interrogation. *See supra*, Section III.A. Therefore, it was reasonable for the state court to also conclude that Mr. Alvarez-Calo's subsequent statements should not be suppressed. The objection is OVERRULED.

### D.   Objection Four: Improper Arguments by Prosecution

Mr. Alvarez-Calo argues that the state court unreasonably applied clearly established law in concluding that the prosecution's alleged misconduct during opening statements did not have "substantial and injurious effect or influence in determining the jury's verdict" thus resulting in "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see* Dkt. No. 47 at 11–12. Mr. Alvarez-Calo insists that the use of a "jigsaw puzzle analogy," an assertion that he had been "spin[ning] a story," and references to drug use "were indeed so egregious that they impacted the jury's verdict and deprived him of due process under the law." *Id.*

The objection fails because Mr. Alvarez-Calo does not show that these statements had a "substantial and injurious effect" on the jury's verdict. *Brecht*, 507 U.S. at 637; *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43 (1974))). As the

magistrate judge noted, the trial judge immediately addressed the "spin[ning] a story" and drug use comments with the jury (Dtk. No. 42-1 at 454–57), and "[a] jury is presumed to follow its instructions."[8] *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *accord Samia v. United States*, 143 S. Ct. 2004, 2013 (2023) (observing "the law's broader assumption that jurors can be relied upon to follow the trial judge's instructions"). Further, Mr. Alvarez-Calo has not demonstrated how the jigsaw puzzle analogy could have substantially and injuriously affected the jury's verdict. In the context of the entire trial, it was reasonable for the state court to conclude that the prosecution's statements did not deprive Mr. Alvarez-Calo of due process. *See Boyde v. California*, 494 U.S. 370, 384–85 (1990); *Greer v. Miller*, 483 U.S. 756, 765 (1987). And this is not the "unusual case" where the prosecution's actions "so infect[ed] the integrity of the proceeding" as to warrant relief without a showing of effect on the jury's verdict. *Brecht*, 507 U.S. at 639 n.9. The objection is OVERRULED.

### E.     Objection Five: Ineffective Assistance of Counsel in Failure to Object

Mr. Alvarez-Calo argues that the state court unreasonably applied clearly established law in concluding that his counsel's failure to object to testimony that he was bailed out of jail did not constitute ineffective assistance of counsel. *See* Dkt. No. 47 at 12–15. He argues that avoiding attention to a harmful and improper statement is "not a valid strategic reason" to withhold an objection (*id.* at 13–14), nor is the belief that the objection will be overruled "cause" to withhold it (*id.* at 14). Mr. Alvarez-Calo further argues that "[t]here was a lot of room left for the jury" to speculate as to the nature of the offense for which he was jailed. *Id.*

---

[8] Mr. Alvarez-Calo argues that "requiring [him] to prove that the jury disregarded the instruction is an unreasonable demand . . . particularly given the serious nature of the violations committed by the prosecutor." Dkt. No. 47 at 12; *see also* Dkt. No. 42 at 47 (calling this "an undue and indeed largely unsurmountable burden on a defendant"). Whatever the merits of this critique, the Court is bound by Supreme Court precedent and the stringent standard of habeas review.

Mr. Alvarez-Calo's objection fails because he cannot demonstrate either deficient performance or prejudice under *Strickland*. *See supra*, Section III.B. As the magistrate judge noted, counsel's failure to object may have been a reasonable tactical decision designed to avoid attention to the harmful statement. *See Strickland*, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955))). Further, even if counsel's performance was deficient, Mr. Alvarez-Calo does not demonstrate that, but for the testimony, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. And because the *Strickland* standard is a general rule, the state court had "even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123. The objection is OVERRULED.

### F. Objection Six: Evidentiary Hearing and Certificate of Appealability

Finally, Mr. Alvarez-Calo objects to the magistrate judge's denial of an evidentiary hearing and a certificate of appealability. Dkt. No. 47 at 15–16. He argues that an evidentiary hearing would assist the Court in assessing various issues in this matter, including the "true totality of the circumstances" of his interrogation, his attorneys' performance, and his own "intellectual and linguistic shortcomings." *Id*. at 15. *But see supra* n.5. Mr. Alvarez-Calo also argues that a certificate of appealability is due because "jurists of reason" could disagree on "several of the issues," including *Miranda* custody and ineffective assistance. *Id*. at 16.

Mr. Alvarez-Calo's objection fails. Because Mr. Alvarez-Calo does not proffer evidence that would entitle him to relief, and because the state record "otherwise precludes habeas relief," the Court "is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). And while jurists of reason might disagree on some of the issues as matters of first

impression, they would *not* disagree that the state court was reasonable in its application of clearly established law, nor would they conclude that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

## IV. CONCLUSION

Accordingly, the Court ADOPTS the Report and Recommendation (Dkt. No. 46) and OVERRULES Mr. Alvarez-Calo's objections (Dkt. No. 47).

Dated this 1st day of August 2023.

Tana Lin
United States District Judge